**Application of Kenneth W. RAREY and John B. Kennedy, Jr.**
**Patent Appeal No. 8898.**

United States Court of Customs and Patent Appeals.
July 19, 1973.

Vincent L. Ramik, Diller, Brown, Ramik & Holt, Arlington, Va., attorneys of record, for appellants. William H. Holt, Arlington, Va., of counsel.

S. Wm. Cochran, Washington, D. C., for the Commissioner of Patents. R. V. Lupo, Washington, D. C., of counsel.

Before MARKEY, Chief Judge, RICH, BALDWIN and LANE, Judges, and ALMOND, Senior Judge.

BALDWIN, Judge.

This appeal is from the decision of the Patent Office Board of Appeals, adhered to on reconsideration, sustaining the rejection of claims 10, and 12–16 in appellants' application,[1] on the basis of 35 U.S.C. § 103. Claims 1–9 and 11 have been allowed.

## The Invention

The invention relates to an electrostatic printing apparatus which is adequately described with reference to Fig. 1a and 2, reproduced below, by a passage from appellants' brief quoted thereafter:

FIG.1a

FIG.2

[A7625]

As is shown in Figure 1a, a developer 10 is comprised of electrically conductive carrier particles 11 and electrically non-conductive toner particles 12. A layer of developer 10 is, in Figure 2, disposed upon an endless conductive belt base electrode 30 in which spaced relation below a stencil screen 16 which itself is spaced below a substrate 25 which is to have an image printed thereon by depositing the non-conductive toner 12 in an image as determined by openings in the stencil screen 16. A power source 52 has its positive side connected to the stencil screen 16 and its negative side to the base electrode 30 to create an electric field between the base electrode and the stencil screen for causing oscillation of the developer 10. During the printing operation, some of the toner 12 is deposited upon the substrate 25 and additional toner 12 becomes accumulated upon stencil screen 16 so that, after two or three prints, stencil screen 16 becomes so contaminated with electrically non-conductive toner that printing operations must be stopped and stencil screen 16 must be cleaned. In this

1. Serial No. 802,747, filed February 17, 1969, which is stated to be a continuation of Serial 599,822, filed December 7, 1966, now abandoned, as a division of Serial 396,060, filed September 14, 1964, now Patent No. 3,306,193.

type of printing environment, appellants' invention resides in the feature of connecting stencil screen 16 to the negative side of a power source 53 and connecting base electrode 30 to the positive side of the power source 53. As a result, an electric field is established between the base electrode and stencil screen but the electrical field is oriented in the *opposite direction* from the direction of the electrical field which existed therebetween during the printing operation. The net effect of reversing the direction of the electric field causes no change in the oscillation of the carrier particles 11 between the base electrode and stencil screen; however, rather than a printing operation occurring, the toner particles 12 which had clogged the stencil screen 16 are returned to the base electrode 30 leaving the stencil screen 16 free of accumulated toner so that a subsequent printing operation of high quality printing can be immediately effected by once again reversing the direction of the existing electric field. It is preferable that the stencil screen 16 be cleaned between each printing operation * * *, the time actually used for cleaning typically being from 0.1 seconds to 0.4 seconds.

During the cleaning step, after the reversal of the electric field, appellant states that:

the developer particles oscillate vigorously between the screen and belt similarly to their motion during printing. * * * The carrier particles mechanically dislodge accumulated toner from the screen when they strike it during the oscilations [sic]. Once dislodged, the electric field carries the toner away from the screen.

Claims 10, 12 and 14 are representative for the purposes of this appeal:

10. In an electrostatic printing apparatus, a base electrode and a stencil screen, a developer comprising electrically non-conductive toner particles and electrically conductive carrier particles, means for depositing said developer upon said base electrode, means for establishing an electric field between said base electrode and said stencil screen for causing said carrier particles to oscillate within said electric field between said base electrode and said stencil screen, and apparatus means for causing toner particles to be returned from said stencil screen to said base electrode subsequent to a printing operation.

12. In an electrostatic printing apparatus as defined in Claim 10 wherein said apparatus means comprises means for reversing the direction of said electric field and means for agitating said stencil screen for dislodging toner particles therefrom whereby the dislodged toner particles are carried by said reversed electric field to said base electrode.

14. In an electrostatic screen printing apparatus, first means for cleaning electrically non-conductive toner particles from a stencil screen subsequent to a printing operation, said first means including said stencil screen and a base electrode, a voltage source for establishing an electric field between said stencil screen and said base electrode, and second means for causing toner particles to be freed from said stencil screen and attracted toward said base electrode.

Claim 13 adds to claim 12 that the oscillating carrier particles agitate the stencil screen. Claim 15, dependent on claim 14, additionally recites that the "second means" includes a "third means for agitating" the stencil screen. Claim 16 adds to claim 15 that the "third means" comprises conductive particles for bombarding said stencil screen.

*The Prior Art*

Watson[2] discloses a method of electrostatically depositing phosphor dots or

2. Patent No. 2,940,864, issued June 14, 1960.

strips as illustrated in Figure 2, reproduced below:

**Fig. 2**

[A7626]

A picture tube face plate 12, coated with a thin film 14 of tacky material, is positioned above an apertured conductive masking plate 10, screen 30, and conductive base plate 16. The base plate is covered with phosphor particles 18. The patent states:

> The present invention is based primarily on the tendency of a small particle to oscillate in the electrostatic field between two conductive plates. This takes place because the particle on striking one plate acquires a charge such that it is successively attracted to the other plate. If one plate has a hole in it the particle will eventually pass through the hole in a direction nearly normal to the plate.

The apertures in Watson's masking plate 10 allow some particles to pass therethrough to form dots 22 on the face plate. Watson recites that "[t]he primary function of * * * screen [30] is to break up any agglomerates which may be present in the phosphor."

Gundlach [3] discloses a xerographic "developer mixture" for use in "cascade" development of an image on a xerographic plate. The plate includes a photoconductive insulating layer which overlies a conductive backing member. A pattern of electrical charges in the shape of the desired image is formed on the plate. The developer mixture is allowed to flow by gravity or "cascade" across the plate. The developer mixture is made up of generally spherical carrier particles, conductive cylindrical filaments, and non-conductive toner powder. The formation of the visual image results from the adherence of the toner powder to the charged portions of the plate. Our interest centers around the carrier particles which, like the filaments, bear the much smaller particles of toner material. The carrier particles may comprise:

> * * * a granular carrier material which is of sufficient specific gravity such as glass, sand or steel beads to insure against adherence of the granular carrier material to the image bearing surface as the carrier cascades across the surface being developed. The granular carrier should also have a desired triboelectric relationship to the toner material and if it is not inherent in the carrier material it may be coated or encased in a suitable covering to impart thereto these necessary properties. Generally the particle size of the carrier material should be in the range of from 20 to 200 mesh and preferably between the range of 30 to 100 mesh.

The "desired triboelectric relationship" is clarified by a statement that the carrier material may be:

> * * * either conducting or insulating, provided the particles of granular material when brought in close contact with the electroscopic powder particles acquire a charge having an opposite polarity to that of the electroscopic powder particles, such that the electroscopic powder particles adhered to and surround the granular carrier particles. The granular carrier material is selected so that the particles acquire a charge having the same polarity as that of the photoconductive insulating layer of the plate on which the electrostatic image is produced, and an electrical attraction for the elec-

3. Patent No. 2,965,573, issued December 20, 1960.

troscopic powder particles considerably less than that of the charged areas of the plate and somewhat greater than the discharged areas of the plate. The purpose of the carrier particles, which is described in a patent to Wise,[4] is to inhibit the toner powder from forming into balls that streak and smear the image. Gundlach adds the filaments to facilitate complete development (adherence of toner) of large solid areas of the image.

Schaffert[5] discloses an electrostatic printing apparatus as illustrated in Figure 2 reproduced below:

**FIGURE 2**

[A7627]

Electrically nonconductive image layer 9 is mounted on an electrically conductive rotating drum 1. A positive charge pattern is formed upon portions of the image layer by corona discharge mechanisms 30–33 and 34–36 such that negatively charged developer powder cascading over the image layer from receptacle 11 adheres to the charged portions. Electrostatic charging means 34a, 35a applies a negative charge to the developer powder to increase the charge on the powder image. Paper 18 from supply roll 19 is passed over the drum in contact with the image layer 9 thereon with charging means 30, 31 applying a positive charge of a sufficient intensity to attract the powder away from the drum and thus transfer it to the paper. Thereafter stripping fingers 21 strip the paper from

4. Patent No. 2,618,552, issued Nov. 18, 1952.

5. Patent No. 2,576,047, issued Nov. 20, 1951.

the drum. After the paper is so stripped, charging means 44–46 of negative polarity act "to loosen" the excess toner adhering to the drum by "neutralizing the charge" on the power to insure that cleaning means 38 will remove excess powder. Schaffert states "the cleaning means 38 may consist of any suitable wiping instrumentality extending across the image layer of the drum, a suction device, brush, air blast, or other means that would be effective to remove adhering powder from the image layer before the latter is again subjected to a powder dusting operation."

Childress et al.[6] (Childress) discloses a method and apparatus for electrostatic screen printing which is shown in its simplest form in Figure 1, reproduced below:

[A7628]

Conductive stencil screen 10 is provided to transfer a desired image to the sheet of paper 12. The paper is backed by conductive plate 14. Roller 18 with a felt-like covering 19 is dipped in a toner powder and rolled on the outer surface of the stencil screen. The stencil screen and backing plate are oppositely charged to establish an electric field therebetween. The toner powder contacting

the charged stencil screen acquires its charge and is repelled by it and attracted toward the oppositely charged backing plate. The toner collects on the interposed paper in the form of the unmasked area on the stencil screen. Concerning the toner, the patent states:

It has been found that some powder materials are polarity sensitive and will therefore produce better printing for one polarity of voltage on the printing screen. It is believed that the triboelectric charging of the particles is responsible for this effect. The effect seems more pronounced for larger particle sizes of highly insulating particles. However, any suitable pigment powder may be employed, such as, for example, carbon black, dry dye powders, and plastic toner. Particle size and degree of powder dispersion are factors in the charging and migration process. At the present time fine powders 1–10 micron diameter, solid particles are satisfactory with 500 mesh screen stencils.

### The Rejection

The examiner considered that it would have been obvious to make the screen 30 and masking plate 10 of Watson integral, such a structure being shown by Childress, and to substitute a mixture of carrier particles and toner as exemplified by Gundlach for the phosphor powder of Watson. The examiner further held that it would have been obvious in view of Schaffert to provide a reverse charge "to any member which carries unwanted powder particles." The board affirmed the examiner's rejection and additionally stated that "it would be obvious to pass the pigment through the stencil in the Childress et al. device in the manner taught by Watson." At oral argument appellant effectively conceded that if the combination of the teachings of Watson, Gundlach and Childress in

6. Patent No. 3,081,698, issued March 19, 1963.

the manner proposed by the Patent Office were valid, then the rejection of the instant claims over those references in view of Schaffert would be sustainable.

### Opinion

We are unable to sustain the rejection either as it was put forth by the examiner or in the alternative form suggested by the board. Whatever combination of the teachings of Watson and Childress is made, we find nothing in the record before us which indicates that it would have been obvious to substitute the relatively large and heavy *carrier particles plus toner particles* of Gundlach for the toner particles of Childress or phosphor particles of Watson. The smearing problem encountered in Gundlach's gravity cascade system which induced him to utilize the large, heavy carrier particles obviously would not occur in any stencil apparatus obtained by the combination of the teachings of Watson and Childress. While we doubt that the Gundlach patent would qualify as being in a "non-analogous art" because of the difference in his method, there is certainly nothing in that patent which would suggest that his particles would be useful in a stencil method such as Watson's or Childress's. In both Watson and Childress the only particles in the system are those which are to be deposited on the printed surface, *viz.*, the toner or phosphor particles. There is nothing to suggest that the addition of larger particles which never reach the printed surface would be desirable or even useful. In the absence of appellant's own teachings, one skilled in the art would see no reason to go from a simple system in which only the toner particles need be accelerated, to a more complicated one in which the carrier particles have to be accelerated up to the screen with sufficient force to dislodge the toner particles they carry, which then must continue to travel until they reach the printing surface.

The examiner referred to the following reasoning concerning the rejection of slightly different claims in a previous appeal to the board in the application of which the present application is a streamlined continuation:

[T]he developer of the Watson patent is conductive as noted by applicant and is purely toner particles without any carrier particles. As specifically taught by Watson * * *, this developer will oscillate in an electric field. When a developer or toner is not conductive however, it is necessary to provide some additional means to cause oscillation. This is conventionally done by mixing conductive carrier particles with the toner particles to form a developer which is a combination of both carrier and toner.

To this appellants respond:

Appellants respectfully ask, *"conventionally done!—by whom?"* Not one of the patents of record teaches or suggests that a combination of conductive particles and non-conductive particles will oscillate in an electric field!

We find ourselves in agreement with appellants. In the first place, the particles in Watson are phosphor particles for deposition on picture tube faces, not toner particles in a printing system. If one were to adapt Watson's process for a printing system, as by following the teachings in Childress, one would have to choose which type of toner particles to use. There is nothing in this record which would tell the skilled artisan that the toner particles must be conductive. Watson does not even mention whether or not his phosphor particles are conductive. The only desirable attribute the skilled artisan would obtain from the pertinent teachings in Watson, reproduced *supra,* is that the particles be *small.* The relevant portions of Childress, on the other hand, indicate a preference for *nonconductive* toner particles:

It has been found that some powder materials are polarity sensitive and will therefore produce better printing for one polarity of voltage on the printing screen. It is believed that

the triboelectric charging of the particles is responsible for this effect. The effect seems more pronounced for larger particle sizes of highly insulating particles. However, any suitable pigment powder may be employed, such as, for example, carbon black, dry dye powders, and plastic toner. Particle size and degree of powder dispersion are factors in the charging and migration process. At the present time fine powders 1–10 micron diameter, solid particles are satisfactory with •500 mesh screen stencils.

Thus it can be seen that the examiner's reasoning was based on conjecture, unsupported by this record. Further, in order for the skilled artisan to obtain the system defined by appellant's claims, it would not only be necessary to find the nonexistent teaching that the toner particles must be conductive, but it would also be necessary, in the face of that teaching, to choose *not* to use conductive toner particles, but instead to use *nonconductive* toner particles, figuring some way to get them to act as if they were conductive toner particles, as by providing conductive carrier particles for them. If the skilled artisan would have followed this road and used the carrier/toner system of Gundlach, we must agree that he would have obtained a system which *inherently* would behave in the same manner as appellants', if the voltage were switched between the stencil screen and the base plate. However, the question under the statute is whether it would have been obvious for one of ordinary skill in the art to do so, and on this record we are convinced that it would not have been.

The decision of the board is reversed.

Reversed.

MARKEY, Chief Judge.

I concur in the result. The rejection on the cited combination of references is in error. No reference discloses means for returning the toner particles to a base electrode.